1

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato

2

Marion C. Passmore
580 California Street, Suite 1200

3

San Francisco, CA 94104
Telephone: (415) 568-2124

4

Facsimile: (212) 214-0506
fortunato@bespc.com

5

passmore@bespc.com

6

*Counsel for Plaintiff*

7

[Additional Counsel on Signature Page]

8

9

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| JONATHAN BITTON, derivatively on behalf of IOVANCE BIOTHERAPEUTICS, INC., | Case No.: |
| Plaintiff, | |
| v. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| JEAN-MARC BELLEMIN, IGOR P. BILINSKY, ATHENA COUNTOURIOTIS, IAIN DUKES, DANIEL G. KIRBY, RYAN MAYNARD, WAYNE ROTHBAUM, FREDERICK G. VOGT, MICHAEL WEISER, and WENDY L. YARNO, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| IOVANCE BIOTHERAPEUTICS, INC., | |
| Nominal Defendant. | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Plaintiff Jonathan Bitton ("Plaintiff"), by and through his undersigned counsel, hereby

25

submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal

26

defendant Iovance Biotherapeutics, Inc. ("Iovance" or the "Company") against the Individual

27

Defendants (defined below) seeking to remedy their breaches of fiduciary duties and other violations

28

of law during the period from May 9, 2024 through May 8, 2025 (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation:  (a) review and analysis of public filings made by Iovance with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Iovance; (c) review of news articles, stockholder communications, and postings on Iovance's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from securities fraud class actions pending in this Court captioned *Sundaram v. Iovance Biotherapeutics, Inc.*, Case No. 5:25-cv-04177-EKL (N.D. Cal.) (the "*Sundaram* Action") and *Farberov v. Iovance Biotherapeutics, Inc.*, Case No. 3:25-cv-04199-JD (N.D. Cal.) (collectively, the "Securities Class Actions"); and (e) review of other publicly available information concerning Iovance and the Individual Defendants.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty and other violations of law against certain officers and members of the Company's Board of Directors (the "Board").

2.      Iovance is a commercial-stage biopharmaceutical company that develops and commercializes cell therapies using autologous tumor infiltrating lymphocyte for the treatment of metastatic melanoma and other solid tumor cancers in the United States.

3.      One of the Company's products is Amtagvi, a tumor-derived autologous T cell immunotherapy used to treat adult patients with unresectable or metastatic melanoma.

4.      On February 16, 2024, the U.S. Food and Drug Administration ("FDA") approved Amtagvi® (lifileucel) for use in the treatment of adult patients with certain skin cancers. Iovance commercially launched Amtagvi four days later, on February 20, 2024.

5.      As part of the launch of Amtagvi, Iovance began distributing the drug to authorized treatment centers ("ATCs") across the United States. On May 9, 2024, Iovance issued a press release touting "strong momentum" in the launch of Amtagvi and a "transformative" first quarter of fiscal

year 2024. The Company announced that onboarding was complete at "more than 40 U.S. ATCs, up from 30 initial ATCs at approval" and stated that it was "on track to onboard approximately 50 ATCs by the end of May 2024[.]" Iovance further stated that it expected its "launch momentum to remain strong and continue to build" throughout fiscal year 2024 "with the authorization of additional ATCs."

6.      Iovance continued to paint a rosy picture of growth and an expanding ATC network in press releases announcing its financial results for the second, third, and fourth quarters of fiscal year 2024. Specifically, the Company repeatedly indicated confidence in its ability to achieve product revenue of $450-475 million in fiscal year 2025.

7.      In reality, the new ATCs were unable to keep pace with the Company's manufacturing of Amtagvi, because the ATCs and the Company's sales teams were ineffective at identifying and selecting patients for treatment with Amtagvi, leading to higher patient drop-offs, and the new ATCs were experiencing longer times to begin treating patients with Amtagvi. As a result, the Company experienced higher costs and lower revenue than represented in its public statements regarding its financial results and outlook. This, combined with the Company's failure to maintain adequate internal controls, made the statements issued by the Company materially false and misleading.

8.      The truth began to come to light when on May 8, 2025, in a press release announcing the Company's financial results for the first quarter of 2025 (the "1Q25 Press Release"), Iovance revealed that its total product revenue for 1Q25 was just $49.3 million, a $24 million reduction from the previous quarter. Iovance further revealed that it had reduced its total product revenue projection for fiscal year 2025 from $450-470 million to just $250-300 million. The Company explained that it was "revising [its] full-year 2025 revenue guidance to reflect recent launch dynamics" for Amtagvi and that "[t]he updated forecast considers experience with ATC growth trajectories and treatment timelines for new ATCs."

9.      As of the filing of this action, the Company's financial outlook remains significantly reduced from the lofty projections Iovance previously made. On August 7, 2025, in a press release announcing the Company's financial results for the second quarter of 2025, Iovance again projected total product revenue of just $250-300 million for fiscal year 2025.

10.     The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by knowingly engaging in the deceptions alleged herein.

11.     As a direct and proximate result of the misconduct described herein by the Individual Defendants, Iovance has sustained significant damages as explained below.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)(1)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9).

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and the Securities Class Actions are pending in this District.

## PARTIES

17.     Plaintiff is a stockholder of Iovance, was a stockholder of Iovance at the time of the wrongdoing alleged herein and has been a stockholder of Iovance continuously since 2021.

18.     Nominal Defendant Iovance is incorporated under the laws of Delaware with its principal executive offices located at 825 Industrial Road, Suite 100, San Carlos, California 94070. Iovance's common stock trades on the Nasdaq exchange under the symbol "IOVA."

19.    Defendant Frederick G. Vogt ("Vogt") has served as the Company's interim Chief Executive Officer ("CEO") since June 2021, as General Counsel of the Company since July 2017, and as a Board member since June 2024. He also serves as a member of the Company's Scientific Committee. Vogt is named as a defendant in the Securities Class Actions. For fiscal year 2024, Vogt received $10,953,193 in compensation.

20.    Defendant Jean-Marc Bellemin ("Bellemin") served as the Company's Chief Financial Officer ("CFO") from November 2020 to July 10, 2025. Bellemin is named as a defendant in the Securities Class Actions. For fiscal year 2024, Bellemin received $3,247,940 in compensation.

21.    Defendant Igor P. Bilinsky ("Bilinsky") has served as the Company's Chief Operating Officer ("COO") since March 2021. Bilinsky is named as a defendant in the Securities Class Actions. For fiscal year 2024, Bilinsky received $3,247,940 in compensation.

22.    Defendant Daniel G. Kirby ("Kirby") has served as Chief Commercial Officer of the Company since February 2025. Kirby is named as a defendant in the *Sundaram* Action.

23.    Defendant Iain Dukes ("Dukes") has served as Chairman of the Board since August 2016. He also serves as Chair of the Company's Nominating and Corporate Governance Committee. For fiscal year 2024, Dukes received $2,618,992 in compensation.

24.    Defendant Ryan Maynard ("Maynard") has served as a member of the Board since February 2015. He also serves as Chair of the Company's Audit Committee. For fiscal year 2024, Maynard received $1,329,492 in compensation. Additionally, on November 12, 2024, Maynard sold 50,000 shares of Iovance at the inflated price of $10.06 per share while in possession of non-public information, netting proceeds of $503,000.00.

25.    Defendant Athena Countouriotis ("Countouriotis") has served as a member of the Board since June 2019. She also serves as a member of the Nominating and Corporate Governance Committee and a member of the Compensation Committee. For fiscal year 2024, Countouriotis received $1,329,492 in compensation.

26.    Defendant Wayne Rothbaum ("Rothbaum") has served as a member of the Board since June 2016. He also serves as a member of the Scientific Committee and a member of the

Compensation Committee. For fiscal year 2024, Rothbaum received $1,919,000 in compensation.

27.    Defendant Michael Weiser ("Weiser") has served as a member of the Board since March 2018. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee, Scientific Committee, and Nominating and Corporate Governance Committee. For fiscal year 2024, Weiser received $2,423,992 in compensation.

28.    Defendant Wendy L. Yarno ("Yarno") has served as a member of the Board since June 2023. She also serves as a member of the Audit Committee. For fiscal year 2024, Yarno received $902,242 in compensation.

29.    Collectively, Defendants Vogt, Bellemin, Bilinsky, Kirby, Dukes, Maynard, Countouriotis, Rothbaum, Weiser, and Yarno are herein referred to as the "Individual Defendants" and the Individual Defendants together with Iovance are referred to herein as the "Defendants."

30.    Collectively, defendants Maynard, Weiser, and Yarno are herein referred to as the "Audit Committee Defendants."

**THE INDIVIDUAL DEFENDANTS' FIDUCIARY
DUTIES TO THE COMPANY AND ITS STOCKHOLDERS**

31.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Iovance and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and were and are required to use their utmost ability to control and manage Iovance in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Iovance and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

32.    Each Individual Defendant owed and continues to owe Iovance, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

33.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Iovance, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions

with Iovance, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, finances, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

34.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

    a)  ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

    b)  conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

    c)  remain informed as to how Iovance conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

    d)  truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

35.    Additionally, the Company's Code of Conduct and Ethics (the "Code"), which applies to all directors, officers, and employees of Iovance, provides that all directors, officers, and employees

must be knowledgeable of and conduct business in accordance with all applicable laws, rules, and regulations. Specifically, the Code states:

**Introduction**

Iovance Biotherapeutics, Inc. (the "Company") will conduct its business honestly and ethically wherever we operate. This Code of Business Conduct and Ethics (this "Code") covers a wide range of business practices and procedures. It does not cover every issue that may arise, but it sets out basic principles to guide all directors, officers and employees of the Company. All of our directors, officers and employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior. This Code should also be provided to and followed by the Company's other agents and representatives, including consultants.

In accordance with applicable law and stock exchange regulations, this Code will be posted on the Company's website and/or otherwise made available for examination by our stockholders.

**Honesty and Integrity**

Our business is based on mutual trust, honesty and integrity in all of our affairs, both internally and externally. This philosophy must be respected at all times. Each of us must be truthful in our business dealings with each other, and with our auditors, legal counsel, regulators and loan review and compliance staffs. Illegal, dishonest and fraudulent acts are grounds for termination. Making false statements or otherwise misleading internal or external auditors, attorneys, regulators or loan review and compliance personnel is prohibited. You must never withhold or fail to communicate fully information that is requested in connection with an appropriately authorized investigation or review. Any concealment of information is a violation of your employment agreement, which may result in termination of your employment with the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Company and could constitute a criminal act. You must also comply at all times with the Company's Whistleblower Policy.

\*      \*      \*

**Accuracy of Company Records and Reports**

The Company is committed to maintaining records, data and information that are accurate and complete so as to permit the Company to make timely and accurate disclosures to its regulators and to its stockholders. You are personally responsible for the integrity of the information, reports and records under your control. Records must be maintained in sufficient detail so as to reflect accurately the Company's transactions and activities. Our financial statements must be prepared in accordance with generally accepted accounting principles ("GAAP") and fairly present, in all material respects, the financial condition and results of the Company. To accomplish full, fair, and accurate reporting, you must ensure that financial reports issued by the Company are timely, accurate, understandable, and complete.

Business records and communications often become public, and we should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to text messages, e-mail, internal memos, and formal reports. Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the Company's internal legal counsel, or if internal counsel is not available, then the Company's outside legal counsel.

**Compliance with Laws, Regulations and Company Policies and Procedures**

The Company's activities shall always be in full compliance with applicable laws and regulations. Further, all employees of the Company must have an understanding of

and comply with the Company's policies and procedures. When such laws, regulations or Company policies are ambiguous or difficult to interpret, you should seek advice from the Company's internal legal counsel, or if internal counsel is not available, then from the Company's outside legal counsel.

The Company's product candidates and its operations are also subject to extensive and rigorous regulation by the U.S. Food and Drug Administration and foreign health authorities. Violation of these regulations can result in severe civil and criminal penalties, adverse publicity for the Company, suspension of the Company's clinical trials, total or partial suspension of production of a Company product candidate, withdrawal of a future Company product from the market, and disciplinary action by the Company against the responsible individuals, up to and including termination of employment. You are required to comply with all such requirements.

The Company promulgates policies and procedures, such as the Company's Healthcare Compliance Manual, and provides training sessions to promote compliance with laws, regulations and Company policies and procedures. Compliance with these policies and procedures is required. Additional training can be provided upon request.

**Conflicts of Interest**

You must conduct your private, business, and personal activities in a manner that avoids conflict with, or even the appearance of conflict with, your ability to act solely in the interests of the Company. A conflict of interest arises if you have interests of any nature that compromise your ability to act objectively and in the best interests of the Company. Conflicts can arise directly or through your family members or through business or other entities in which you or your family members have an interest. At no time may you, on behalf of the Company, transact personal business, the business of

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

an immediate family member, or the business of a for profit entity in which you or a member of your immediate family has an interest (other than an interest not exceeding 1% in a publicly traded company (a "Permitted Public Company Interest")), with the Company. In all such situations, you must disqualify yourself from involvement with any transaction or relationship between that person and the Company.

Conflicts of interest are prohibited as a matter of Company policy. Conflicts of interest may not always be clear-cut, so if you have a question, you should consult with your manager, Human Resources, or the Company's internal legal counsel, as applicable.

36.     In addition to these duties, defendants Maynard, Weiser, and Yarno had enhanced duties and responsibilities, per the Audit Committee Charter:

The principal purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Iovance Biotherapeutics, Inc. (the "Company") is to oversee the integrity of the Company's accounting and financial reporting processes, audits, and financial statements. In particular, the Committee shall monitor (a) the integrity of the Company's accounting and financial reporting processes; (b) the Company's compliance with legal and regulatory requirements as related to financial reporting; (c) the qualifications, independence, and performance of the Company's independent registered public accounting firm, referred to herein as the "independent auditors," including determining whether to engage or dismiss the independent auditors; and (d) the performance of the Company's internal audit function, if any. The Committee shall also prepare the report required by the U.S. Securities and Exchange Commission (the "Commission") to be included in the Company's annual proxy statement. In addition to the powers and responsibilities expressly delegated to the Committee in this charter (this "Charter"), the Committee may exercise any other powers and carry

out any other responsibilities delegated to it by the Board from time to time consistent with the Company's bylaws and applicable law.

37.     Per the Audit Committee Charter, defendants Maynard, Weiser, and Yarno also had the following responsibilities:

*Financial Statement and Disclosure Matters*

1.  Review and discuss with management and the Company's independent auditors the Company's annual audited financial statements (including the related notes), including disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2.  Review and discuss with management and the Company's independent auditors the Company's quarterly financial statements (including the related notes) prior to the filing of its Form 10-Q, including the results of the independent auditors' review of the quarterly financial statements.

3.  Review and discuss matters required to be discussed pursuant to the Public Company Accounting Oversight Board (the "PCAOB") Auditing Standard No. 1301 "Communications with Audit Committees" and other applicable requirements of the PCAOB and the Commission as well as the form of audit opinion to be issued by the independent auditors on the financial statements.

4.  Discuss with management and the Company's independent auditors significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, the quality and adequacy of the Company's internal controls, and any special steps adopted in light of material deficiencies in such controls.

5.  Review and discuss quarterly reports from the independent auditors on: (a) all critical accounting policies and practices to be used; (b) all alternative treatments

of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; (c) other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences; and (d) conformance with auditing standards.

6.  Review and discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies.

7.  Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies, and discuss with management any off-balance sheet transactions, arrangements, or obligations in which the Company has an interest.

8.  Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification and disclosure process for reports on Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

*Oversight of the Company's Relationship with the Independent Auditors*

9.  Pre-approve all auditing services, including the annual audit plan, and permitted non-audit services (including the fees and terms thereof) to be performed for the Company or for the Committee or Board by the Company's independent auditors; provided that, to the extent permitted by Commission regulations, (a) the Committee may delegate such pre-approval authority to the Chairperson; provided

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

that, the Chairperson promptly reports all such approvals to the full Committee, and (b) the Committee may adopt pre-approval policies and procedures regarding the services to be rendered by the independent auditors.

10.  Meet with the independent auditors prior to the audit to discuss the planning and staffing of the audit. Discuss with the Company's independent auditors significant matters relating to the conduct of audits and attestation reports on management's assessment of internal control over financial reporting, including any difficulties encountered in the course of audit work, any restrictions on the scope of activities or access to requested information, any significant disagreements with management, and the adequacy of the Company's internal control over financial reporting and disclosure controls and procedures. Discuss with the independent auditors matters relating to the report of the Committee that are required by Commission rules to be included in the Company's annual proxy statement. The Committee shall be responsible for resolving any disagreements between management and the independent auditors.

11. Obtain from the Company's independent auditors annually a formal written statement delineating all relationships between the independent auditors and the Company, discuss with the independent auditors any such disclosed relationships and their impact on the independent auditors' independence, and take or recommend that the Board take appropriate action regarding the independence of the independent auditors. Ensure the rotation of the audit partners as required by applicable law and monitor the Company's hiring of employees or former employees of the independent auditors to ensure compliance with applicable law.

12. If required by applicable Exchange Act regulations, obtain and review an annual report by the Company's independent auditors describing the firm's internal quality-control procedures and any material issues raised by the most recent internal quality-control review, or peer review of the firm, or by any inquiry or

investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any issues.

13. Evaluate the qualifications, performance, and independence of the Company's independent auditors, including considering whether the independent auditors' quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the independent auditors' independence. The Committee shall present its conclusions with respect to the independent auditors to the Board at least once each year.

*Compliance Oversight Responsibilities*

14. At the conclusion of each audit, obtain from the Company's independent auditors' assurance that the independent auditors are not required to report to the Company under Section 10A(b) of the Exchange Act any illegal act.

15. Approve or reject proposed related party transactions. Obtain reports from management that the Company and its employees are in compliance with applicable legal requirements and the Company's Code of Conduct.

16. Keep the Company's independent auditors informed of the Committee's understanding of the Company's relationships and transactions with related parties that are significant to the Company; and to review and discuss with the Company's independent auditors the auditors' evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

17. At least once each calendar year, review with management the Company's (a) material investor relations, public relations, and stock promotion firms to confirm that there are no relationships between any of those firms and any of the Company's officer or directors, and (b) compliance with all other policies and

procedures the Company has adopted or enacted regarding (i) the Company's dealings with investor relations, public relations, and stock promotion firms, and (ii) public communications about the Company or its securities, including such communications at any time that the Company is "in registration."

18. Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

19. Discuss with management and the Company's independent auditors any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

20. Discuss with the Company's General Counsel and/or outside counsel any legal matters that may have a material impact on the financial statements or the Company's compliance policies.

*Other*

21. Review with the independent auditors and management the scope and results of the internal audit program, if any, including responsibilities and staffing, and review the adequacy and performance of the internal audit functions, if any, of the Company.

22. Review on a periodic basis, or as appropriate, the investment policy of the Company and (a) as needed, report to the Board on the status of the investment portfolio pursuant to that policy, and (b) recommend to the Board any changes to the investment policy determined by the Committee to be necessary or appropriate.

23. Consider, and if determined to be appropriate, adopt a policy for the hiring by the Company of employees or former employees of the independent auditors.

24. Periodically review, assess, and make recommendations to the Board regarding the adequacy of the Company's insurance policies, including without limitation its director and officer insurance policy.

25. At least annually, (a) perform an evaluation of the performance of the Committee and its members, including, but not limited to, a review of the Committee's compliance with this Charter, and (b) provide any written material with respect to such evaluation to the Board, as appropriate, including, but not limited to, any recommendations for changes in procedures or policies governing the Committee.

26. At least annually, (a) review and reassess the adequacy of this Charter and recommend any proposed changes thereto to the Board for its approval, and (b) report to the Board.

27. Perform any other activities consistent with this Charter, the Company's bylaws, Nasdaq rules, and governing law and regulations as the Committee deems necessary or appropriate.

28. Work with the Company's Chief Financial Officer and/or its General Counsel to maintain minutes of meetings and periodically report to the Board on significant results of the foregoing activities.

29. Meet periodically with senior management, including senior information technology personnel when necessary, to review the Company's cybersecurity, data privacy, and other information technology risks and strategies to protect the Company's business systems and information and to respond to incidents.

30. Discuss with management and the Board policies with respect to risk assessment and risk management, and review and discuss with management, the Board, and the Company's independent auditors any annual reports by management on the Company's internal control over financial reporting that are required by Commission rules and any related attestation reports that are required from the independent auditors pursuant to Commission rules.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

31. Review: (i) the status of compliance with laws, regulations, and internal procedures; and (ii) the scope and status of systems designed to promote Company compliance with laws, regulations, and internal procedures, through receiving reports from management, legal counsel, and third parties, as determined by the Committee.

## SUBSTANTIVE ALLEGATIONS

**BACKGROUND**

38.    Iovance is a commercial-stage biopharmaceutical company that focuses on the discovery and development of cell therapies to treat metastatic melanoma (skin cancer) and other solid tumor cancers.

39.    Throughout the Relevant Period, the Company marketed and distributed Amtagvi, its proprietary autologous T cell immunotherapy for treatment of adults with certain skin cancers. Amtagvi is distributed to patients treated at the Company's ATCs.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE AND/OR MISLEADING STATEMENTS DURING THE RELEVANT PERIOD**

40.    Through a series of communications, the Individual Defendants breached their fiduciary duties by making or authorizing materially false and misleading statements and failing to disclose material adverse facts about the Company's business, operations, and prospects.

41.    On May 9, 2024, Iovance issued a press release announcing its financial results for the first quarter of fiscal year 2024 (the "1Q24 Press Release"). In the 1Q24 Press Release, CEO Vogt described the first quarter of 2024 as "transformative for Iovance" following the FDA approval of, and "strong start for the U.S. commercial launch of [,]" Amtagvi. He further announced that as of the date of the press release, "more than 100 patients have already enrolled for Amtagvi therapy" and the Company had "successfully manufactured and delivered Amtagvi to many ATCs where commercial patients are being treated." Vogt stated that he expected the Company's "launch momentum to remain strong and continue to build . . . with the authorization of additional ATCs" and that the Company was "well positioned to remain the global leader in innovating, developing, and delivering [tumor

infiltrating lymphocyte ("TIL")] cell therapy for patients with cancer." The Company highlighted its Iovance Cell Therapy Center ("*i*CTC"), stating that "[c]apacity expansion" was "underway at *i*CTC to supply TIL cell therapies for more than 5,000 patients annually in the next few years."

42. The Company also listed the following "Recent and First Quarter 2024 Highlights and Corporate Updates" in the 1Q24 Press Release:

- The U.S. FDA approved Amtagvi (lifileucel) on February 16, 2024, as the first treatment option for advanced melanoma after anti-PD-1 and targeted therapy. Amtagvi is also the first and only FDA-approved T cell therapy for a solid tumor indication.

- Since approval, more than 100 patients have enrolled for Amtagvi therapy. The first patients have been successfully treated and the balance are moving through the stages of the journey, which includes surgery for cell collection, manufacturing, and the Amtagvi treatment regimen.

- Onboarding is complete at more than 40 U.S. ATCs, up from 30 initial ATCs at approval. Iovance remains on track to onboard approximately 50 ATCs by the end of May 2024 and expects to have more than 70 ATCs onboarded by the end of 2024.

- Manufacturing turnaround time has been on-target with initial launch expectations of approximately 34 days from inbound to return shipment to ATCs. The commercial manufacturing experience to date is consistent with prior clinical experience.

- The U.S. launch of Amtagvi, and additional sales of Proleukin® used with the treatment regimen, are expected to drive significant revenue for Iovance in 2024.

43. The same day, Iovance issued a Form 10-Q filed with the SEC reporting its first quarter 2024 financial results (the "1Q24 10-Q"). In the 1Q24 10-Q, the Company acknowledged that its statements concerning its "ability to successfully commercialize Amtagvi™ (lifileucel)[,]" the "size and growth potential of the markets for [its] products" and its "ability to serve those markets" involved

"risks, uncertainties and other factors that *may cause* actual results, levels of activity, performance or achievements to be materially different from the information expressed or implied" in the 1Q24 10-Q. (Emphasis added). Nevertheless, the Company stated that commercialization of Amtagvi was its "top priority" and touted its "experienced marketing, payer access and distribution teams as well as a sales force with extensive experience in oncology and cell therapy." The Company also stated that the *i*CTC was "among the largest cell therapy manufacturing facilities in existence" and that "expansion" was "under way" and would "significantly increase this capacity." Iovance identified the following as the "four primary areas" of its Amtagvi launch efforts:

- onboarding of authorized treatment centers, or ATCs, for commercial launch with the goal of activating 50 ATCs within 90 days of the BLA Prescription Drug User Fee Act date of February 24, 2024;

- collaboration with healthcare professionals, or HCPs, who will be administering our product;

- operational excellence in launch execution, commercial manufacturing and delivery of therapy; and

- ongoing and continuous communication with payors about the value of Amtagvi™.

44.    Iovance announced its second quarter 2024 financial results in a press release issued August 8, 2024 (the "2Q24 Press Release"). Again, Vogt reported that there was "strong" demand for Amtagvi, which "continues to increase as authorized treatment centers (ATCs) adopt Amtagvi and community referral networks are mobilized to drive patients to ATCs." Vogt stated that "broader utilization of Amtagvi among an expanding ATC network" was "expected to accelerate quarterly growth throughout" fiscal years 2024 and 2025. Again, he asserted that Iovance was "well positioned to remain the global leader in innovating, developing, and delivering TIL cell therapy for patients with cancer."

45.    The 2Q24 Press Release also announced "Total Product Revenue Guidance" for fiscal year 2025 of $450-470 million based on continuing "[r]obust growth for Amtagvi [] as existing ATC

demand increases and new ATCs are onboarded." The Company further noted that "[o]nboarding [was] complete at more than 50 U.S. ATCs across 29 states[,] [] more than 90% of addressable patients [were] now located within 200 miles of an ATC[,] [and] [m]ore than 70 ATCs remain[ed] on track to be onboarded by the end of 2024." Again, the Company stated that expansion was underway at the *i*CTC, and that Iovance expected to "supply TIL cell therapies for more than 5,000 patients annually in the next few years[,]" with a "long-term goal" of "establish[ing] a manufacturing network to address more than 10,000 patients annually."

46.     In an earnings call held the same day, CEO Vogt explained that the Total Product Revenue Guidance was "based upon [the Company's] ongoing experience and confidence in the strong uptake and significant quarter-over-quarter growth in the Amtagvi demand" and stated that the Company "expect[ed] significant year-over-year growth ***driven by scale-up in existing and new ATCs*** and robust community referral networks contributing to additional demand." (Emphasis added).

47.     Also that same day, Iovance issued a Form 10-Q filed with the SEC reporting its second quarter 2024 financial results (the "2Q24 10-Q"). Again, in the 2Q24 10-Q, the Company acknowledged that its statements concerning its "ability to successfully commercialize Amtagvi™ (lifileucel)[,]" the "size and growth potential of the markets for [its] products" and its "ability to serve those markets" involved "risks, uncertainties and other factors that ***may cause*** actual results, levels of activity, performance or achievements to be materially different from the information expressed or implied[.]" (Emphasis added). Iovance reiterated that expansion was underway at the *i*CTC, "with a long-term goal of establishing a manufacturing network to address tens of thousands of patients." The Company also reiterated that the commercialization of Amtagvi remained its "top priority" and identified the following as the "four primary areas" of its Amtagvi launch efforts:

- onboarding of authorized treatment centers, or ATCs, for commercial launch with the goal of activating approximately 70 ATCs, by the end of 2024;
- education, training, and collaborating with healthcare professionals, or HCPs, who will be administering our product;

- operational excellence in launch execution, commercial manufacturing, and delivery of therapy; and

- ongoing and continuous communication with payors about the value of Amtagvi™ to facilitate strong reimbursement and patient access.

48.    Iovance announced its third quarter 2024 financial results in a press release issued on November 7, 2024 (the "3Q24 Press Release"). The Company reaffirmed its fiscal year 2025 total product revenue projection of $450-475 million. CEO Vogt stated that the Company was "executing a successful U.S. commercial launch of Amtagvi" and that "[r]obust demand for Amtagvi . . . continue[d] to grow as [the Company's] expanding network of authorized treatment centers (ATCs) . . . broaden[ed] the utilization of Amtagvi, driving a higher volume of patient referrals." Again, Vogt stated that "Iovance is well positioned to remain the global leader in innovating, developing, and delivering current and future generations of TIL cell therapy for patients with cancer." The Company announced that "[o]nboarding [was] complete at 56 U.S. ATCs across 29 states[,] [] more than 90% of addressable patients [were] now located within 200 miles of an ATC[,] [and] [a]pproximately 70 ATCs remain[ed] on track to be onboarded by the end of 2024." Again, Iovance stated that expansion would enable the *i*CTC to "supply TIL cell therapies to more than 5,000 patients annually in the next few years" and represented that the Company was "developing a manufacturing network to address more than 10,000 patients annually."

49.    That same day, the Company hosted an earnings call wherein CEO Vogt explained that the decision to reaffirm the $450-475 million total product revenue projection was based on the Company's expectation of "a significant increase in year-over-year growth as ATC's broaden utilization and new ATCs as well as community referral networks contribute to additional demands."

50.    In the Form 10-Q reporting its third quarter 2024 results, also issued on November 7, 2024 (the "3Q24 10-Q"), Iovance again acknowledged that its statements concerning its "ability to successfully commercialize Amtagvi™ (lifileucel)[,]" the "size and growth potential of the markets for [its] products" and its "ability to serve those markets" involved "risks, uncertainties and other factors that *may cause* actual results, levels of activity, performance or achievements to be materially

different from the information expressed or implied[.]" (Emphasis added). The Company reiterated its statements from the 2Q24 10-Q about expansion of the *i*CTC. The 3Q24 10-Q identified the following as the "four primary areas" of Iovance's Amtagvi launch efforts:

- onboarding of authorized treatment centers, or ATCs, for commercial launch with the goal of activating approximately 70 ATCs, by the end of 2024;

- education, training, and collaborating with healthcare professionals, or HCPs, who will be administering our product, as well as community oncologists who will be referring patients to the ATCs;

- operational excellence in launch execution, commercial manufacturing, and delivery of therapy; and

- ongoing and continuous communication with payors about the value of Amtagvi™ to facilitate strong reimbursement and patient access.

51.    Iovance then issued another press release on February 27, 2025, announcing its financial results for the fourth quarter of fiscal year 2024 and full fiscal year 2024 (the "4Q24 Press Release"). Again, the Company reaffirmed its $450-475 million total product revenue projection for fiscal year 2025, noting that "Amtagvi adoption is on track to continue accelerating throughout 2025 with broader utilization, higher demand, and growth in community referrals." CEO Vogt announced that "[s]trong demand and growth [were] continuing and on track to accelerate" for Amtagvi in 2025, and stated that the Company's "top commercial priorities [were] to drive broader adoption and utilization, increase patient referrals, add large community practices to [the Company's] authorized treatment center (ATC) network, expand the U.S. market, and secure regulatory approvals in three new markets outside the U.S." Again, Vogt stated that he was "confident that Iovance is well positioned to remain the global leader in innovating, developing, and delivering current and future generations of TIL cell therapy for patients with cancer."

52.    In the 4Q24 Press Release, the Company announced total product revenue of $73.7 million for the fourth quarter of 2024, of which $48.7 million came from U.S. sales of Amtagvi. The Company also announced that total product revenue for the full fiscal year 2024 was $164.1 million,

representing "the high end of the [C]ompany's guidance range of $160 to $165 million for the full year 2024[,]" with $103.6 million in revenue attributable to sales of Amtagvi. Further, Iovance touted the "significant growth potential at existing ATCs[,]" noting that "[a]mongst current ATCs, 76% completed tumor resections, 64% infused one or more patients, and 13% infused more than 10 patients[.]" The Company stated that it had "completed annual scheduled maintenance at the *i*CTC and successfully restarted full production." The Company also highlighted the progress of its ATC onboarding, stating that:

- Approximately 70 U.S. ATCs are active across 32 states and 95% of addressable patients live within 200 miles of an ATC. Additional U.S. ATCs will be added steadily throughout 2025, focusing on quality ATCs with a high volume of eligible patients, including large community practice ATCs.

- Community referral activities are increasing throughout the U.S. to drive additional patient volume to these ATCs. Large community practices are currently onboarding, creating a new and significant opportunity for more patients to receive Amtagvi after frontline therapy.

- Manufacturing turnaround time is aligning with launch expectations of approximately 34 days from inbound to return shipment to ATCs. Efforts are underway to shorten the turnaround time in 2025. The commercial manufacturing experience remains consistent with prior clinical experience.

53.     On the same day, the Company hosted an earnings call wherein CEO Vogt explained that the Company's total product revenue projection "reflects more than 200 patients already treated with Amtagvi in the partial first year of launch" and touted Iovance's "successful execution as well as the unmet need in advanced melanoma, high awareness, broad patient access and ***a motivated expanding network of authorized treatment centers or ATCs***[.]" (Emphasis added). He stated that the Company's ATCs "continue to drive increasing demand for Amtagvi" and that the Company's "manufacturing network is well prepared to supply the current and anticipated demand for Amtagvi." Vogt represented that the Company had "staffed capacity to supply more than 1,200 patients per year"

and were continuing to "scale up for additional U.S. and global launch growth." He said that "in the back half of" fiscal year 2024, the Company had "augmented [its] investment in focused community referral initiatives" with a focus on "driving additional demand in [the Company's] ATCs, as they scale up to treat more patients."

54.     Defendant Vogt also fielded questions from investors on the earnings call:

Q: Fred, on prior calls you've provided an update on the number of patients infused thus far in the quarter. Just wondering if you'd be willing to share where you stand as of today? And then just remind us or help us understand what gives you the confidence that the range for full year '25, which was set when you're only 1 quarter into the launch is still intact.

Vogt: Yes, sure, Andrea. We're not -- from -- in the press release and on the call, we're not going to be providing the infusions right now. We're not sure how useful that metric was to long investors. And as some of you know, it's prone to overinterpretation. We provide some different metrics this time around, including the potential for growth at the ATCs. And that actually is a part of the answer to your second question, if you look at our press release and heard [Defendant Kirby's] commentary, within the 70 ATCs that we have right now, only 13% of infused in more than 10 patients, *which gives you a very good idea of the upside that we're expecting, the acceleration we're expecting in the second half and second quarter of 2025* here as we go through. So we still have confidence in those numbers because *the growth curve for this type of product can accelerate quite a bit, and we see that happening across our ATC network right now. We see the potential for that in the ATCs.*

*        *        *

Q: I understand you're not giving intra-quarter updates going forward, but since you did provide in 4Q[,] [c]an you speak, was there a slowdown in infusions in the back half of the quarter? And did you see any seasonality in 4Q?

Vogt: Colleen, no, we don't see any seasonality. As [Defendant Bilinsky] mentioned, we did have a manufacturing maintenance period there. So we have those kind of things in cell therapy. If you look at the launch curves for ABECMA, YESCARTA, and CARVYKTI, you'll see there's little peaks and dips and valleys in those as things like that happen so – but nothing in terms of a holiday seasonality. That's what you're asking.

*    *    *

Q: This is Nick on for Tyler. Thinking about guidance – 2025 guidance, is the potential price increase currently included in that guidance? And also, how should we think about the global ex-U.S. expansion having a potential impact on guidance?

Vogt: Yes. The price increase that's coming in April has been factored into that guidance for . . . Amtagvi. And right now, the guidance doesn't include any contribution from ex-U.S.

*    *    *

Q: Appreciate the updates, look forward to 2025. So a quick one is, in terms of the launch uptake, what exactly would you say is the bottleneck at this juncture? If it's not patient demand nor supply chain nor even beds at sites, **what is the gating factor to seeing an acceleration in sales for 2025 like you guided?**

Vogt: So I think, above all, the ATCs that are starting up now have to get their feet under them and get running. **We've got some ATCs that are performing very, very well right now**. And we've got a lot more that are working their way up. I think in each ATC, there's a difference -- **each individual ATC has its own little bottlenecks or whatever it might be**. Some of them have staffing issues, some of them have financial clearance challenges that we're helping out with. **But all these things are pretty easily resolvable, and we've been able to show that a good portion of our ATCs**

26

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    *can really fly right now, and we think we can get a lot more there pretty soon*. Dan,

2    go ahead.

3

4    Kirby: Sure. And Andrew, I think one thing to add on top of what Fred said regarding

5    not really a bottleneck, but there's a process they go through. They have to make sure

6    they operationally can do it again. We're the first TIL in the market. ***So there's a***

7    ***learning curve there***. As you see, we said 13% have hit 10% or more, that number

8    continues to grow. So once they hit that wave where they understand how to use the

9    product with it, then the lever really is to pull the referrals and drive more patients in

10    there. And that's where we're working with the community, not only at the clinic level,

11    but also the leadership level and the community to make sure that those centers are

12    getting to see the most patients.

13    (Emphasis added).

14    55.    Defendant Kirby also spoke to investors on the earnings call, discussing Iovance's

15    expectations for the growth of its ATC network in fiscal year 2025:

16    Throughout 2024, we scaled up our ATC network to meet the growing patient demand

17    and fulfill significant interest among health care providers to offer Amtagvi to their

18    patients. After launching with an unprecedented 30 ATCs on day 1, we reached our

19    target of approximately 70 ATCs at the end of 2024. Our ATC network now spans 32

20    states and nearly all treated melanoma patients live within a 2-hour drive of the closest

21    center.

22

23    We treated more than 200 patients with commercial Amtagvi within the first 3 quarters

24    of launch, and Amtagvi is positioned for significant growth across our ATC network

25    in 2025 and beyond.

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Amongst the 70 current ATCs, 76% completed tumor resections, 64% infused Amtagvi, 53% infused 2 or more patients and 13% infused more than 10 patients. ***These metrics demonstrate significant growth potential, as our ATCs scale up to accommodate growing patient demand.***

New ATCs are preparing to treat initial patients. ***Our more experienced ATCs are steadily growing or plan to increase utilization throughout 2025***, **and** *we expect new ATCs will follow similar trends*, as we add steadily throughout 2025. ***These additional ATCs will be selected for high quality and volume of eligible patients, including large community practices.***

To further drive adoption, earlier patient identification and higher referral volume into our ATC network, Iovance field teams are actively engaging top community oncologists and large community practices with a focus on high-volume markets. Additionally, we are aligned with leadership at key community organizations on their preferred ATCs for patient referrals. As more patients embark on their treatment journey, we are making steady progress to speed up the time to intact the infusion.

(Emphasis added).

56.    Defendants Bellemin and Bilinsky also spoke to investors on the call, with Bellemin emphasizing the Company's total product revenue projection and Bilinsky explaining that the *i*CTC had completed its "brief annual maintenance" period and "resumed production promptly at full volume with no issues." Bilinsky noted that the Company expected "the same positive outcome following the upcoming scheduled maintenance" at the Company's "contract manufacturer."

57.    Iovance also issued its annual report for fiscal year 2024 on February 27, 2025, in a Form 10-K filed with the SEC and signed by defendants Vogt, Bellemin, Weiser, Maynard, Dukes, Rothbaum, Countouriotis, and Yarno (the "FY24 10-K"). In addition to again cautioning that its "ability to successfully commercialize Amtagvi™ (lifileucel)[,]" the "size and growth potential of the

markets for [its] products" and its "ability to serve those markets" involved "risks, uncertainties and other factors that *may cause* actual results, levels of activity, performance or achievements to be materially different from the information expressed or implied[,]" Iovance identified a number of risk factors faced by its business, including the following:

> **We have limited commercial experience and may be unable to establish effective marketing and sales capabilities or enter into agreements with third parties to market and sell our products and product candidates, if they are approved, and as a result, we may be unable to generate significant product awareness, and the lack of awareness may limit the revenues that we generate.**
>
> We currently have a commercial team focused on our commercial strategy, but we do not have a large commercial infrastructure for the marketing, sale, and distribution of biopharmaceutical products. In order to commercialize our products, we must continue to build our marketing, sales, and distribution capabilities or make arrangements with third parties to perform these services, which will take time and require significant financial expenditures, and we may not be successful in doing so. In addition, we rely on one or more third-party distributors for the commercial sale of our products. It may be difficult to pivot from our current distributors of biopharmaceutical products in the event that any agreements with such third-party distributors are terminated. If we need to enter into alternative arrangements, this could adversely affect our business. Furthermore, even if we are able to effectively establish a sales force and develop a marketing and sales infrastructure, our sales force and marketing teams may not be successful in commercializing our current or future product candidates. To the extent we rely on third parties to commercialize any products for which we obtain regulatory approval, we would have less control over their sales efforts and could be held liable if they failed to comply with applicable legal or regulatory requirements.

In addition to marketing our product, *we will need current and future ATCs both inside and outside the U.S. that are prepared and have the capacity and experience to administer our therapies to patients.* Even if we are able to obtain approval for a product candidate in a country or region, *we may not be able to approve enough treatment centers for the provision of our product to a broad patient population.* The number of ATCs we onboard to administer our product may fluctuate and affect our product launch, and even if we onboard a large number of ATCs, this does not ensure the uptake of our products. Additionally, certain areas do not have hospitals with the facilities to safely administer our therapy. Accordingly, we may only be able to launch our products with a limited number of ATCs, which could ultimately reduce the uptake of our products. Although we have a team allocated to authorize and monitor our ATCs, substantial resources and investment from us and each treatment center may be required. Additionally, the treatment center onboarding process can be complicated and requires extensive training, technical equipment, and coordination of processes. *Once authorized, ATCs will be required to ensure that their training, facilities, and treatment capabilities are adequately maintained.*

We have limited prior experience in the marketing, sale, and distribution of biopharmaceutical products, and there are significant risks involved in the building and managing of a commercial infrastructure. The establishment and development of commercial capabilities, including a comprehensive healthcare compliance program, to market any products we may develop will be expensive and time consuming and could delay any product launch, and we may not be able to successfully develop this capability. We, or our collaborators, will have to compete with other pharmaceutical and biotechnology companies to recruit, hire, train, manage, and retain marketing, sales, and commercial support personnel. Although we have developed a commercial infrastructure, in the event we are unable to continue to develop a successful

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

commercial infrastructure, we may not be able to commercialize our current or future product candidates, which would limit our ability to generate product revenues. (Emphasis added).

58.    Defendant Kirby fielded additional questions about the Company's total product revenue guidance for fiscal year 2025 from investors at Barclays's 27th Annual Global Healthcare Conference on March 13, 2025:

Q: [Y]ou've mentioned the product and the launch, just how should we think about the factors influencing guidance, what brings you to the top and bottom end of those ranges and what are the moving parts?

Kirby: Sure. So the factors for the guidance really are our existing ATCs. We have 70 ATCs that are stood up right now. And of those, over 3/4 have done a tumor tissue procurement. Over 2/3 have done an actual infusion to a patient and over half of them have infused multiple patients, 13% are at that expert level of 10 plus. ***Our guidance really is about maximizing for this year their progress through that spectrum to keep treating more and more patients and to maximize the potential inside of those accounts.*** We also simultaneously this year with the upper end, we have other initiatives that are getting into the referral patterns with the community and looking at where they're sending patients, sending those to the expert accounts and standing up new ATCs where we know patients are flowing in. So that's the perspective on the guidance with it. ***We can do it with our existing ATCs, but we're also being opportunistic to see if we can get more volume of patients by increasing the referral patterns into them.***

*            *            *

Q: [A]re things positioned where 1Q could show an acceleration of growth? Or is it more back-end loaded? How should we be thinking about it?

31

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Kirby: It's a great question. We don't want to talk about first quarter right now until we have the earnings call. But what I would say is if you look at our initiatives with the accounts that are ramping up, we're having more enter into that expert level of 10-plus infusions. And then the other ones are ramping along and progressing with it. We're expecting significant half of this year with it, but we do feel that it will be more of a yearly look than a quarterly look.

(Emphasis added).

59.    What the Individual Defendants did *not* disclose in any of these statements is that risks to the commercialization of Amtagvi and the Company's ability to serve the market for that drug were not merely hypothetical. They were actual and significant, making the statements referenced in paragraphs 41-58 above, and the rosy picture painted by the Company's fiscal year 2024 press releases and SEC filings, materially false and/or misleading. Specifically, the Individual Defendants failed to disclose to investors that: (1) new ATCs were experiencing longer timelines to begin treating patients with Amtagvi; (2) the Company's sales team and new ATCs were ineffective in patient identification and patient selection for Amtagvi, leading to higher patient drop-offs; (3) the foregoing dynamics led to higher costs and lower revenue because ATCs could not keep pace with manufactured product; and (4) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**THE BOARD ISSUES A FALSE AND MISLEADING PROXY**

60.    On April 28, 2025, Iovance filed an annual proxy statement  with the SEC (the "2025 Proxy"), soliciting shareholder approval for, *inter alia*: (1) the re-election of defendants Vogt, Dukes, Countouriotis, Maynard, Rothbaum, Weiser, and Yarno to the Board; (2) an amendment to the Company's 2018 Equity Incentive Plan (the "2018 Plan") to increase the number of shares of the Company's common stock authorized for issuance thereunder by 12,500,000 shares; (3) an amendment to the Company's 2020 Employee Stock Purchase Plan (the "2020 ESPP") to increase the number of shares of the Company's common stock authorized for issuance thereunder by

1,000,000 shares; and (4) the ratification of the appointment of Ernst & Young LLP ("E&Y") as the Company's independent registered public accounting firm for the year ending December 31, 2025.

61.     Regarding the Board's role in risk oversight the 2025 Proxy stated:

Our Board of Directors is comprised of seven directors, of whom six are independent in accordance with the applicable Nasdaq independence listing standards. Our Board of Directors and its committees meet regularly throughout the year to assure that the independent directors are well briefed and informed with regard to the Company's affairs. Each of the independent directors has access to the executive officers of the Company. In this fashion, we seek to maintain well informed, independent directors who are prepared to make informed decisions regarding our business affairs.

Management is responsible for the day-to-day management of risks the Company faces, while our Board of Directors as a whole plays an important role in overseeing the identification, assessment, and mitigation of such risks. Our Board of Directors reviews information regarding the Company's finances and operations, as well as the risks associated with each. For example, the oversight of financial risk management lies primarily with the Audit Committee, which is empowered to appoint and oversee our independent auditors, monitor the integrity of our financial reporting processes and systems of internal controls and provide an avenue of communication among our independent auditors, management and our Board of Directors. The Compensation Committee is responsible for overseeing the management of risks relating to the Company's compensation plans and arrangements. In fulfilling its risk oversight responsibility, our Board of Directors, as a whole and acting through any established committees, consults with management to evaluate and, when appropriate, modify our risk management strategies.

62.     The 2025 Proxy stated the following regarding the Company's Audit Committee:

The Audit Committee operates pursuant to a written charter. Among other things, the Audit Committee is responsible for:

- appointing, approving the compensation of, and assessing the independence of our independent registered public accounting firm;

- overseeing the work of our independent registered public accounting firm;

- reviewing and discussing with management and the independent registered public accounting firm our annual and quarterly financial statements and related disclosures;

- monitoring our internal control over financial reporting, disclosure controls and procedures and Code of Conduct and Ethics;

- overseeing our internal audit function;

- meeting independently with our internal auditing staff or consultants, independent registered public accounting firm and management;

- reviewing and approving or ratifying any related person transactions;

- discussing with management and the Board of Directors policies with respect to risk assessment and risk management, including cybersecurity, data privacy, and other information technology risks and strategies;

- periodically reviewing and assessing the adequacy of our insurance programs, including directors' and officers' insurance programs, and recommending any changes to such programs to our Board of Directors; and

- preparing the Audit Committee Report required by SEC rules [ ].

63.     The above statements conveyed that the Board and its committees maintained sufficient compliance, internal controls, risk controls, review, and reporting programs to identify and address deficiencies in the Company's financial reporting; yet was unaware of existing material risks that could and would affect the Company. The above statements also gave assurances that the auditor was being properly overseen and audit disclosures were accurate.

64.     The 2025 Proxy omitted any disclosures regarding the adverse facts specified herein. The 2025 Proxy failed to disclose, *inter alia,* that: (1) new ATCs were experiencing longer timelines to begin treating patients with Amtagvi; (2) the Company's sales team and new ATCs were ineffective

in patient identification and patient selection for Amtagvi, leading to higher patient drop-offs; (3) the foregoing dynamics led to higher costs and lower revenue because ATCs could not keep pace with manufactured product; and (4) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

65.    Due to the false and misleading 2025 Proxy, shareholders voted to approve each of the proposals in the 2025 Proxy.

66.    The 2025 Proxy harmed Iovance by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting Iovance. As a result of the false or misleading statements and omissions of adverse facts in the 2025 Proxy, Iovance stockholders voted to (1) reelect defendants Vogt, Dukes, Countouriotis, Maynard, Rothbaum, Weiser, and Yarno to the Board; (2) approve the amendment to the Company's 2018 Plan to increase the number of shares of the Company's common stock authorized for issuance thereunder by 12,500,000 shares; (3) approve an amendment to the Company's 2020 ESPP to increase the number of shares of the Company's common stock authorized for issuance thereunder by 1,000,000 shares; and (4) ratify E&Y as Company's independent registered public accounting firm for the year ending December 31, 2025.

**THE TRUTH IS REVEALED**

67.    The truth regarding Iovance's financial situation was revealed in a press release issued on May 8, 2025 (the "1Q25 Press Release"), in which the Company announced that in the first quarter of fiscal year 2025, it had achieved total product revenue of just $49.3 million – a $24 million reduction from the fourth quarter of fiscal year 2024. CEO Vogt stated that the Company's "first quarter revenue was impacted by a significant reduction in capacity during the annual scheduled maintenance at the Iovance Cell Therapy Center (*i*CTC)." Although Vogt said "full production" had since resumed at the *i*CTC and Iovance "expect[ed] infusions to grow in the second quarter as compared to the first quarter[,] [] based on [the Company's] experience to date," Iovance was "revising full-year 2025 revenue guidance to reflect recent launch dynamics." The Company lowered

its fiscal year 2025 revenue guidance to $250-300 million based on "experience with ATC growth trajectories and treatment timelines for new ATCs."

68.     Nevertheless, the Company maintained that "large community practices are expected to expand market opportunity" and asserted that "Amtagvi adoption w[ould] accelerate in 2025 with broader utilization and higher demand." Iovance noted that amongst "Iovance's treatment network of more than 80 ATCs[,] . . . Fifty-six ATCs completed tumor resections, 48 infused one or more patients, and 11 infused more than 10 patients" and asserted that "[t]hese trends highlight growing adoption and significant growth potential. Several new ATCs are expected to treat their first patients in the remaining weeks of the second quarter of 2025."

69.     On that day's earnings call, defendant Vogt explained the significant reduction in the Company's total product revenue projection as follows:

> First, our internal manufacturing facility, the *i*CTC **completed annual scheduled maintenance in December of last year**, as we previously discussed on last quarter's call.
>
> As a result of limited production starts for multi-week Amtagvi manufacturing across our network, **capacity was reduced by more than half for about 1 month.** In addition, volume was impacted by **higher rates of patient drop-off and lower manufacturing success rates, but has since rebounded.** Today, we are seeing healthy demand with a record number of production starts in the second quarter.
>
> Lower Proleukin sales were the second factor contributing to lower first quarter revenue. We expect 2 of the 3 largest U.S. [ ship ] wholesalers to start replenishing Proleukin in line with growing Amtagvi demand in the second quarter.
>
> We're also growing the other components of our franchise, including sales of Proleukin to third parties for use with manufacturing and clinical research.

The third contributor to first quarter revenue was **the variable pace at which ATCs began treating patients and this differs from center to center.** For context, 16% of ATCs have treated more than 10 patients. Our ATCs have ample room to grow, and we anticipate near-term contributions from ATCs that came online in the latter half of 2024 into 2025.

*        *        *

We revised our guidance to between $250 million and $300 million in total product revenue for the full year 2025.

We consider our experience with growth trajectory with the ATCs, time lines for new ATCs to begin treating their first patients and expectations for large community practices and community referrals to drive momentum in the second half of 2025. These demand trends are consistent with the trajectory of other cell therapy launches moving from year 1 to year 2.

After aligning our manufacturing slot plans with our new demand forecast, we are maintaining our prior cash runway guidance into the second half of 2026.

(Emphasis added).

70.    When asked during the earnings call why the Company felt compelled to "provide guidance for 2025 way back in 2024 to begin with[,]" defendant Vogt said:

Back in August, we were trying to give investors our best line of sight to what we thought was going to happen. At that point, we were very well aware of the high demand for the product, and we were ramping up our manufacturing as fast as we could. **So we built our model on the back of how many manufacturing slots we would make available, maximum ramp.**

Now, as we've gone, **we've learned a lot about the launch, especially recently as we watch some of the dynamics with ATCs, we looked at our experience with growth**

*trajectories there.* We've looked at the time lines it takes for new ATCs to come on board and begin treating their first patients and how they work through their processes. We're onboarding these large community practices, which takes some time, and we're doing the community referral process, which takes a lot of time, too.

And as we looked at that, we just decided that it was better and more accurate for us to forecast guidance that we gave you today, to show you that we can still make this product grow very, very substantially. But now what we're going to do is we're just going to limit some of our manufacturing slots.

Will end up being essentially almost a neutral one with respect to how we use our cash, and we'll roll forwards, and we'll continue to succeed on the launch. ***But we think we'll do it on terms that are, I think, a little bit more in line with what we actually see at the ATCs.***

(Emphasis added).

71.     Defendant Bellemin further explained that the higher patient drop-off rate and lower manufacturing success in the first quarter of fiscal year 2025 was "related to patient selection and the tumor procurement technique" but that the Company remained confident given "the success rate trends that we see among ATCs who have been up and running for a long time and the experience curve that they've been able to achieve."

72.     On this news, the price per share of Iovance common stock dropped from a closing price on May 8, 2025 of $3.17 to a closing price on May 9, 2025 of $1.75.

**THE FALLOUT CONTINUES**

73.     On June 13, 2025, the Company disclosed, in a Form 8-K filed with the SEC, that CFO Bellemin had "provided the Company with written notice under his Executive Employment Agreement, dated November 23, 2020, that he would resign from the Company, effective July 10, 2025, to pursue other opportunities." In a Form 8-K filed with the SEC on July 15, 2025, Iovance

announced that it had "entered into an Executive Employment Agreement with Corleen Roche" to replace Bellemin as CFO effective August 6, 2025.

74.     On August 7, 2025, Iovance issued a press release announcing its financial results for the second quarter of fiscal year 2025 (the "2Q25 Press Release"). The Company reaffirmed the disappointing adjusted total product revenue projection of $250-300 million from the 1Q25 Press Release and disclosed total product revenue of $60 million for the second quarter. Iovance stated that this projection was "in line with current and expected ATC growth trajectories, including large community practices and community referral activities." The Company also announced that it was "implementing a strategic restructuring to optimize business performance, resulting in more than $100 million in annual cost savings starting in the fourth quarter of 2025 and extending cash runway into the fourth quarter of 2026." This would include "a workforce reduction of approximately 19% in the third quarter of 2025."

75.     On this news, shares of Iovance common stock again dropped significantly, down from a closing price of $2.64 on August 7, 2025 to a closing price of $2.10 on August 8, 2025.

## DAMAGES TO IOVANCE

76.     As a result of the Individual Defendants' improprieties, Iovance disseminated improper public statements concerning its operations, prospects, and internal controls. This misconduct has devastated Iovance's credibility.

77.     As a direct and proximate result of the Individual Defendants' actions, Iovance has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Actions.

78.     Further expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

79.     Lastly, the actions of the Individual Defendants have irreparably damaged Iovance's corporate image and goodwill. For at least the foreseeable future, Iovance will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated

in illegal behavior and have misled the investing public, such that Iovance's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

80.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

81.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duty and other violations of law.

82.    Plaintiff is an owner of Iovance common stock and has been an owner of Iovance common stock at all times relevant hereto.

83.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

84.    Plaintiff has hired counsel experienced in conducting derivative litigation.

85.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Iovance Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

86.    At the time of filing this action, the Board consists of defendants Vogt, Dukes, Maynard, Countouriotis, Rothbaum, Weiser, and Yarno (the "Director Defendants"). Plaintiff needs only to allege demand futility as to half of the seven directors who are on the Board at the time this action is commenced.

**DEMAND IS EXCUSED AS TO THE DIRECTOR DEFENDANTS**
**BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

87.    The Director Defendants all face a substantial likelihood of liability for their actions in issuing the false and misleading 2025 Proxy, which resulted in their reappointment to the Board despite their breaches of fiduciary duty.

88.    Demand is excused as to the entire Board, because the Director Defendants breached their fiduciary duties of loyalty by making false and misleading statements about the growth prospects

of Amtagvi, specifically with respect to the capacity of the Company's ATCs and sales teams to identify and treat patients with Amtagvi. The Director Defendants were directors during the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate. Accordingly, the entire Board faces a substantial likelihood of liability for making materially false and misleading statements.

89.     Moreover, the Director Defendants, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company was acting legally, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they reviewed, authorized and/or caused the public statements and publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

90.     If the Director Defendants were to bring a suit on behalf of Iovance to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, making a demand would be futile as to the Director Defendants.

**DEMAND IS EXCUSED AS TO THE AUDIT COMMITTEE DEFENDANTS BECAUSE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

91.     Defendants Maynard, Weiser, and Yarno, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the public statements, presentations, and false financial statements referenced herein, thereby allowing the Company to repeatedly make false and misleading statements to the investing public. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other

financial information provided by the Company, as required by the Audit Committee Charter. For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

**DEFENDANT MAYNARD FACES A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

92.     Defendant Maynard faces a substantial likelihood of liability because, in addition to serving as a member of the Board and Chair of the Audit Committee, he unlawfully misused the material non-public information he obtained through those roles to sell his Iovance shares at artificially inflated prices and unjustly enrich himself at the Company's expense. Because this action asserts claims for unjust enrichment and because Defendant Maynard enjoyed a benefit not shared by the rest of Iovance stockholders, he is incapable of considering a demand to commence and vigorously prosecute this action.

**DEFENDANT VOGT LACKS INDEPENDENCE**

93.     Defendant Vogt is not disinterested for purposes of demand futility because his principal occupation is Interim CEO and President of Iovance. Accordingly, his livelihood is dependent on and completely intertwined with the other Director Defendants.

94.     In addition, Vogt is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Actions.

**COUNT I**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES**

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

96.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Iovance's business and affairs.

97.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

98.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Iovance.

99.    In breach of their fiduciary duties owed to Iovance, the Individual Defendants willfully or recklessly made and/or caused or permitted the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that, *inter alia*: (1) new ATCs were experiencing longer timelines to begin treating patients with Amtagvi; (2) the Company's sales team and new ATCs were ineffective in patient identification and patient selection for Amtagvi, leading to higher patient drop-offs; (3) the foregoing dynamics led to higher costs and lower revenue because ATCs could not keep pace with manufactured product; and (4) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

100.    Accordingly, Iovance's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

101.    The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

102.    The Individual Defendants also failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

103.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.  Such material

misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

104.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

105.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

106.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Iovance has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

107.    Plaintiff, on behalf of Iovance, has no adequate remedy at law.

## COUNT II
### AGAINST THE DIRECTOR DEFENDANTS
### FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9

108.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

109.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of

1    any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C.

2    § 78l]." 15 U.S.C. § 78n(a)(1).

3        110.    Rule 14a-9, promulgated pursuant to Section 14(a), provides that no proxy statement

4    shall contain "any statement which, at the time and in the light of the circumstances under which it is

5    made, is false or misleading with respect to any material fact, or which omits to state any material

6    fact necessary in order to make the statements therein not false or misleading." 17 C.F.R.  § 240.14a-

7    9.

8        111.    Under the direction and watch of the Director Defendants, the 2025 Proxy failed to

9    disclose, *inter alia*, that contrary to those statements' descriptions of the Board's risk oversight

10   function and the Audit Committee's responsibilities, the Board and its committees were not

11   adequately exercising these functions, were causing or permitting the Company to issue false and

12   misleading statements, and thus the Individual Defendants on the Board were breaching their

13   fiduciary duties.

14       112.    The 2025 Proxy was false and misleading and it failed to disclose, *inter alia*, that: (1)

15   new ATCs were experiencing longer timelines to begin treating patients with Amtagvi; (2) the

16   Company's sales team and new ATCs were ineffective in patient identification and patient selection

17   for Amtagvi, leading to higher patient drop-offs; (3) the foregoing dynamics led to higher costs and

18   lower revenue because ATCs could not keep pace with manufactured product; and (4) as a result of

19   the foregoing, the Individual Defendants' positive statements about the Company's business,

20   operations, and prospects were materially misleading and/or lacked a reasonable basis.

21       113.    In the exercise of reasonable care, the Director Defendants should have known that by

22   misrepresenting or failing to disclose the foregoing material facts, the statements contained in the

23   2025 Proxy were materially false and misleading. The misrepresentations and omissions were

24   material to Company shareholders in voting on the matters set forth for shareholder determination in

25   the Proxy Statements, including but not limited to, the reelection of defendants Vogt, Dukes,

26   Countouriotis, Maynard, Rothbaum, Weiser, and Yarno to the Board; the approval of the amendment

27   to the Company's 2018 Plan; the approval of the amendment to the Company's 2020 ESPP; and the

28

reappointment of E&Y as Company's independent registered public accounting firm for the year ending December 31, 2025.

114.    The 2025 Proxy violated Section 14(a) and Rule 14a-9 because they solicited Iovance stockholder votes on these matters while simultaneously misrepresenting and/or failing to disclose the Company's actual business, operations, and prospects.

115.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2025 Proxy.

116.    Plaintiff, on behalf of Iovance, has no adequate remedy at law.

## COUNT III
### AGAINST DEFENDANT MAYNARD
### FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

117.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

118.    During the period of wrongdoing described above, defendant Maynard sold Company stock at artificially inflated prices while in possession of material non-public Company information.

119.    Defendant Maynard sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while he was in possession of material non-public Company information.

120.    While many of the Company's stockholders lost significant money when the Company's shares dropped substantially upon the revelation of the fraud, defendant Maynard sold his shares at artificially high prices and avoided the staggering losses suffered by stockholders.

121.    As a result, defendant Maynard benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of stock and stock options he held.

122.    At the time of the stock sales set forth herein, defendant Maynard knew of the information described above, and sold Iovance common stock on the basis of such information.

123.    The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which defendant Maynard used for his own benefit when he sold Iovance common stock.

124. Defendant Maynard's sale of Company common stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

125. Since the use of the Company's proprietary information for his own gain constitutes a breach of defendant Maynard's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendant Maynard obtained thereby.

## COUNT IV
### AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

126. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127. The Individual Defendants benefitted financially from the improper conduct by receiving bonuses, stock options, or similar compensation from Iovance that was tied to the performance or artificially inflated valuation of Iovance, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

128. Defendant Maynard was also unjustly enriched by his receipt of proceeds from his illegal sales of Iovance common stock, as alleged herein, and it would be unconscionable to allow him to retain the benefits of his illegal conduct.

129. To remedy the Individual Defendants' unjust enrichment, the Court should order these defendants to disgorge to the Company all proceeds derived from their wrongful conduct and/or their illegal sales of Iovance common stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor and against all of the Individual Defendant as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Iovance and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law;

1  C.  Directing all of the Individual Defendants to account for all damages caused by them

2 and all profits and special benefits and unjust enrichment they have obtained as a result of their

3 unlawful conduct, including all salaries, bonuses, fees, stock awards, and options;

4  D.  Ordering defendant Maynard to disgorge the profits obtained as a result of his sale of

5 Iovance stock while in possession of insider information, and imposing a constructive trust thereon;

6  E.  Awarding prejudgment interest to the Company;

7  F.  Granting appropriate equitable relief to remedy the Individual Defendants' breaches

8 of fiduciary duties and other violations of law;

9  G.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable

10 attorneys' fees, accountants' and experts' fees, and costs and expenses; and

11  H.  Granting such other and further relief as the Court deems just and proper.

12
## JURY TRIAL DEMANDED

13 Plaintiff hereby demands a trial by jury.

14

15 Dated:  November 11, 2025     Respectfully submitted,

16             **BRAGAR EAGEL & SQUIRE, P.C.**

17             */s/ Melissa A. Fortunato*
             Melissa A. Fortunato

18             Marion C. Passmore
             580 California Street, Suite 1200

19             San Francisco, CA 94104
             Telephone: (415) 568-2124

20             Facsimile: (212) 214-0506
             Email:  fortunato@bespc.com

21                passmore@bespc.com

22             Brandon Walker (*pro hac vice forthcoming*)
             **BRAGAR EAGEL & SQUIRE, P.C.**

23             810 Seventh Avenue, Suite 620
             New York, NY  10019

24             Telephone: (212) 355-4648
             Facsimile: (212) 214-0506

25             Email:  walker@bespc.com

26             Ligaya T. Hernandez (*pro hac vice forthcoming*)

27             **BRAGAR EAGEL & SQUIRE, P.C.**
             101 Lindenwood Drive, Suite 225

28             Malvern, PA 19355

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Telephone: (646) 860-9155
Facsimile: (212) 214-0506
Email:  hernandez@bespc.com

*Counsel for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Jonathan Bitton, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of Iovance Biotherapeutics, Inc., and authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

10 November 2025                                      *Jonathan bitton*
_____                    Jonathan bitton (Nov 10, 2025 18:00:51 EST)
Date                                                            Jonathan Bitton

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT